[Cite as *State v. Moorer*, 2013-Ohio-650.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## SENECA COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,               CASE NO. 13-12-22

      v.

ANDRE N. MOORER,               O P I N I O N

      DEFENDANT-APPELLANT.

---

**Appeal from Seneca County Common Pleas Court**
**Trial Court No. 11-CR-0177**

**Judgment Affirmed in Part and Reversed in Part**

**Date of Decision: February 25, 2013**

---

APPEARANCES:

    *Scott B. Johnson* for Appellant

    *Derek W. DeVine and Heather N. Jans*   for Appellee

**WILLAMOWSKI, J**.

{¶1} Defendant-Appellant, Andre N. Moorer ("Moorer"), appeals the judgment of the Seneca County Court of Common Pleas, after a jury found him guilty of two counts of trafficking in cocaine. On appeal, Moorer claims that the trial court erred by permitting the introduction of evidence of prior bad acts to the jury, contrary to Evid.R. 404(B), and that the jury's verdict was against the manifest weight of the evidence. For the reasons set forth below, the judgment is affirmed in part and reversed in part.

{¶2} On August 11, 2011, the Seneca County Grand Jury returned a two-count indictment charging Moorer with trafficking in cocaine with school specifications in violation of R.C. 2925.03(A),(C)(4)(b), each a felony of the fourth degree. The charges arose as a result of two undercover drug buys, with the Seneca County Drug Task Force METRICH Enforcement Unit ("METRICH," or "the Task Force") using a confidential informant ("CI"). Both drug buys occurred on September 28, 2010, with the same CI, who purchased crack cocaine from Moorer at his residence, which was within 1,000 feet of a school. Each drug buy was video and audio recorded by the Task Force.

{¶3} A two-day jury trial was held on February 9 and 10, 2012. Detective Donald Joseph, a member of the Task Force and a fifteen-year veteran with the Seneca County Sheriff's Department, was the case manager in charge of both

operations. He testified about the protocol and procedures that were utilized with the CI before, during, and after the drug-buys.

**{¶4}** Detective Joseph explained these two operations followed the typical protocol that was used in controlled purchase operations. As standard "pre-operational protocol," the CI and law enforcement met at a pre-determined location. The CI was searched and patted down to be sure she had no contraband on her person, and she was fitted with an audio transmitter and recorder which serves two functions: 1) to transmit in real time to the listener all the sounds captured by the device during the operation; and, 2) to digitally record all the sounds captured by the device during the operation. Detective Joseph explained that during the pre-operational protocol, the CI is also issued the money to purchase the illegal drugs anticipated to be obtained in the operation. The CI was then dropped off a short distance from Moorer's apartment, and she was watched and videotaped the entire time she was walking to the apartment, until she entered the building. While the detective could not see her when she was inside the building, he monitored the audio recording device, both for purposes of the drug buy, and to assure the safety of the CI.

**{¶5}** After she left the apartment, the CI was also closely watched until she was picked up by Detective Armstrong. At this time, she turned over the drugs she had obtained, and she was again searched. Receipts and documents for the

money and drugs were signed and recorded. Detective Joseph explained that the CI in this case was paid $50 plus given $54.50 in pre-paid cell phone minutes for her assistance with the first drug buy, and she was given consideration for a theft charge in the municipal court in exchange for her assistance with the second buy.

{¶6} Next, Kristi, the CI, testified as to how and why she was working for the Task Force as a CI, and she described what occurred before, during, and after the two drug buys. She explained how she had arranged to purchase some crack cocaine from Moorer, and how she went to Moorer's apartment two times on September 28th. She testified that the first time she stayed for several minutes, and purchased what turned out to be .5 grams of crack cocaine for $100. She also testified that the second buy occurred a little later in the same day, and she purchased a smaller amount of crack cocaine with the $80 that had been provided to her by the detectives.

{¶7} Detective Matthew Armstrong is an officer with the Fostoria Police Department who is assigned to the Drug Task Force, where he primarily does drug investigations, and has been involved with at least 300 to 400 such operations. Detective Armstrong testified as to how he assisted Detective Joseph with these two operations, how he was present before and after the drug purchases for the pre- and post-buy protocols, and how it was his assignment to observe and video-record the CI from outside the apartment building, as she went inside and when

she came out. Detective Armstrong's testimony confirmed and added to the facts and details of the testimony of Detective Joseph and the CI, including all of the procedures that were followed, to ensure that there was no doubt that the drugs had come from Moorer.

{¶8} The State also offered the testimony of two other officers who testified as to their involvement in transporting the evidence and the chain of custody for the drugs. The two substances purchased by the CI were transported to the Ohio Bureau of Criminal Identification and Investigation ("BCI&I"), where they were analyzed and found to contain .5 grams and .3 grams of cocaine, respectively. Scott Dobransy, an experienced forensic scientist at BCI&I, testified concerning the testing procedures he used and confirmed the findings in his laboratory reports, which were admitted into evidence as Exhibits 3 and 7.

{¶9} The county engineer, who was a licensed professional engineer as well as a licensed professional surveyor, testified as to the methodology that was used to determine that Moorer's apartment, where the drug buys occurred, was located 517.94 feet from school grounds, and 608.21 feet from the entrance of the school. The principal of the elementary school also testified to confirm the address/location of the school.

{¶10} Evidence admitted on behalf of the State included video and audio recordings of each of the drug buys, which were played for the jury; the cocaine;

the METRICH covert funds receipts; the drug analysis laboratory results; and a letter and diagram/map from the county engineer.

{¶11} The defense's sole witness was Cory McDonald ("McDonald"), a friend of Moorer who was "hanging out" in the apartment during both of the times that the CI entered on September 28th. McDonald testified that he was watching TV in the living room, along with Moorer's son. He testified that the CI came in for a few minutes during the first visit, and then for a much shorter time later that day. However, McDonald testified that he did not see Moorer give anything to the CI. (Tr. 275) McDonald did not know why she came to the apartment, nor did he ask, but he claimed he did not see Moorer and the CI exchange anything. (Tr. 275)

{¶12} The jury found Moorer guilty on both counts, including the school specifications. After ordering a presentence investigation report, a sentencing hearing was held on April 30, 2012. The trial court sentenced Moorer to thirteen months in prison for each of the two counts, with the sentences to be served concurrent to each other and concurrent to another sentence imposed in a second Seneca County case. The trial court then ordered that these sentences be imposed consecutively to his sentence in a third Seneca County case, resulting in a twenty-four month prison term for the three separate cases. Moorer was also ordered to

pay $284.50 in restitution to the Seneca County Drug Task Force METRICH Enforcement Unit.

{¶13} It is from this judgment that Moorer now appeals, raising the following two assignments of error for our review.

**First Assignment of Error**

**The trial court erred by permitting the introduction of evidence of prior acts to the jury contrary to Rule 404(B) of the Ohio Evidence Rules.**

**Second Assignment of Error**

**The Defendant's conviction was not supported by the manifest weight of the evidence.**

*First Assignment of Error – Improper Evidence of Prior Bad Acts*

{¶14} Moorer complains that several of the witnesses gave testimony alluding to prior criminal acts by Moorer. Moorer argues that this testimony was contrary to Evid.R. 404(B) and was not in compliance with a motion in limine he filed to exclude any references by the State's witnesses to any "prior possible convictions, arrests or contacts" with law enforcement officers. (Mot. in Limine, p. 4)

{¶15} The first specific instance that Moorer complains of was when Detective Joseph was on the stand and the following exchange took place when he was questioned by the State:

Q. During your service with the Drug Task Force, have you become familiar with a person by the name of Andre M. Moorer?

A. Yeah. Yes.

Q. Are you familiar with him by another name?

A. He goes by Dre.

Q. And have you conducted any controlled purchase operations involving Mr. Andre Moorer?

A. Yes, I have.

Q. And have you been personally involved in those operations?

A. Yes, I was.

Q. And do you know who Andre Moorer is?

A. I do.

Q. Is Mr. Moorer in the courtroom today?

A. Yes, he is.

Q. Could you please tell the jury where he is seated, what he is wearing?

[Detective Joseph describes where Moorer is sitting and what he is wearing.]

(Tr. 139-140).

{¶16} The second alleged instance of improper testimony was when Detective Armstrong took the stand and the State asked him essentially the same questions. Detective Armstrong answered the questions in the same way as

Detective Joseph. (Tr. 250-251). No objections were raised to the detectives' testimony.

{¶17} Moorer's third complaint involves the CI's testimony that was given when the State questioned her about how she knew Moorer. (Tr. at 183 et. seq.) The CI testified that she had been friends with his wife and saw them both "a few times a month." Then, the State asked:

Q. Have you bought drugs from him in the past?

A. Yeah.

Q. What type of drugs did you buy from him?

A. Uhm, maybe ecstasy and --

(Tr., at 183.) At this point, defense counsel objected and a side-bar was held off the record. At the conclusion, the trial court overruled the objection. The testimony proceeded with the State asking the CI to identify Moorer in the courtroom, and then proceeded to ask the CI questions about the current drug buys.

{¶18} Moorer claims that this testimony was of "prior illegal drug trafficking" and that it was prejudicial to Moorer. In addition to being inadmissible under Evid.R. 404(B), he claims that the questioning was contrary to the State's "agreement" in response to his motion in limine, when the State

indicated that it would not discuss Detective Joseph's prior involvement with Moorer in conjunction with the Drug Task Force.

{¶19} Evidence of prior criminal acts, wholly independent of the crime for which the defendant is on trial, is inadmissible to show propensity. See *State v. Wogenstahl*, 75 Ohio St.3d 344, 366, 1996-Ohio-219. However, there are exceptions to the general rule. Evid.R. 404(B) permits "[e]vidence of other crimes, wrongs, or acts" to be admitted for purposes "such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." *State v. Williams*, -- Ohio St.3d --, 2012-Ohio-5695, ¶17. Evid.R. 404(B) states in relevant part:

> Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. * * *

{¶20} A motion in limine is a request, made in advance of the actual presentation of the evidence and usually prior to trial, that the court limits or excludes certain evidence which the movant believes is improper. *State v. Black*, 172 Ohio App.3d 716, 2007-Ohio-3133, ¶ 11 (3d Dist.) "The motion asks the court to exclude the evidence unless and until the court is first shown that the material is relevant and proper." *Id.*

{¶21} Moorer filed a motion in limine asking that the State be enjoined from mentioning any prior bad acts that would be inadmissible under the Rules of Evidence, and "more specifically," to exclude any references by the State's witnesses to any "prior arrests," "police contacts," or "convictions." Although the trial court did not specifically rule on this motion, the State responded that it "plan[ned] to introduce only admissible evidence." The matter was discussed briefly with the trial court before trial when defense counsel indicated that it was satisfied with the State's agreement that Detective Joseph would not testify that he had "prior dealings" with Moorer "in his role as a member of the Task Force." (Tr. 6)

{¶22} "'The admission or exclusion of relevant evidence rests within the sound discretion of the trial court.'" *State v. Drummond*, 111 Ohio St.3d 14, 2006–Ohio–5084, ¶ 74, quoting *State v. Sage*, 31 Ohio St.3d 173, (1987), paragraph two of the syllabus. An abuse of discretion is more than an error of judgment; rather, it implies that the trial court's attitude was unreasonable, arbitrary, or unconscionable. *State v. Adams*, 62 Ohio St.2d 151, 157 (1980).

{¶23} First, we note that no objection was made during trial to the testimony of either of the Drug Task Force detectives. Therefore, Moorer has waived all but plain error with regard to the statements made by those witnesses. *State v. Johnson*, 164 Ohio App.3d 792, 2005-Ohio-6826, ¶ 53 (2d Dist.) Plain

error does not exist unless it can be said that, but for the error, the outcome of the trial clearly would have been otherwise. *State v. Long*, 53 Ohio St.2d 91 (1978), paragraph two of the syllabus. In order to have plain error under Crim.R. 52(B), there must be an error, the error must be an "obvious" defect in the trial proceedings, and the error must have affected "substantial rights." *State v. Barnes*, 94 Ohio St.3d 21, 27, 2002-Ohio-68. "Notice of plain error under Crim.R. 52(B) is to be taken with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *State v. Drummond*, 3d Dist. No. 16-11-08, 2012-Ohio-1468, ¶13.

{¶24} In the case at bar, Moorer contends that the statements by the detectives were impermissible because they were evidence of *prior acts* causing prejudice to him. However, the trial itself involved two counts of trafficking in drugs where both detectives were "personally" involved in both drug buy operations. The line of questioning by the State appears to be setting the foundation for the detectives' involvement in the *current cases*, and for their identification of Moorer as the person who sold the drugs. Thus, when the detectives testified that they knew Moorer through their involvement with the Drug Task Force, and they have conducted controlled purchase operations with Moorer, it was to establish their personal knowledge of the testimony they were about to give concerning the operations with the CI that occurred on September

28, 2010. The fact that the statements were in the plural was because there were two separate purchase operations that occurred that day. Then, immediately after the questions were asked, the witnesses were asked to identify Moorer in court. The questions established the foundation for the detectives' ability to identify Moorer as the defendant in *this case*. There was no reference or discussion of any prior dealings with Moorer, nor was there was mention of any arrests or convictions that would cause a reasonable person to believe that the testimony of the detectives would be inadmissible under Evid.R. 404(B). We do not find that the testimony of the detectives amounted to any kind of error, and it certainly did not constitute plain error.

{¶25} An objection was raised to the testimony of the CI, but the trial court overruled the objection and allowed the admission of the CI's testimony that she had bought drugs from Moorer in the past. This was not testimony concerning any prior "convictions, arrests or contacts" with law enforcement officers, that Moorer was concerned about excluding, but merely testimony concerning the CI's relationship with Moorer, how she knew him, and how she came to be purchasing drugs form him the afternoon of the controlled drug buys. Testimony about any other drugs was quickly cut off by the objection, and the State did not raise that matter again. It was already apparent that the CI and the Task Force knew that they could purchase cocaine from Moorer, as this was the basis of the entire covert

operation. Therefore, not only did the CI not provide any new information to the jury, but the line of questioning falls under the exceptions to Evid.R. 404(B) in that it was testimony concerning the CI's knowledge that she would have the opportunity to purchase drugs from him again, because she had done so in the past.

{¶26} The admission of this testimony did not constitute an abuse of discretion on the part of the trial court. The first assignment of error is overruled.

*Second Assignment of Error*

{¶27} In the second assignment of error, Moorer argues that the jury's verdict was against the manifest weight of the evidence for several reasons. Moorer asserts that none of the officers actually saw the transactions take place between the CI and Moorer; the actual exchanges were not filmed by the hidden camera; and, the audio recording did not specifically capture any incriminating dialogue. Furthermore, the male officers who conducted the pre- and post-operational searches of the female CI admitted that they did not search under her clothing or inside body cavities. He claims that the CI was not a reliable witness because she had prior drug convictions and her motivation for her participation in this was to get her own theft charges lowered. And finally, a third person who was present, Cory McDonald, testified that he did not see any drug transactions take place that day.

-14-

{¶28} In determining if a conviction is against the manifest weight of the evidence, an appellate court "review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Mendoza*, 137 Ohio App.3d 336, 346–347 (3d Dist.2000), quoting *State v. Martin*, 20 Ohio App.3d 172, 175, (1st Dist.1983); *see, also, State v. Thompkins*, 78 Ohio St.3d 380, 387 (1997). A new trial should be granted only in the exceptional case in which the evidence weighs heavily against conviction. *Thompkins* at 387.

{¶29} Although the appellate court acts as a "thirteenth juror," it still must give due deference to the findings made by the fact-finder. *State v. Thompson*, 127 Ohio App.3d 511, 529 (8th Dist.1998). The fact-finder, being the jury, occupies a superior position in determining credibility. *Id.* When examining witness credibility, "[t]he choice between credible witnesses and their conflicting testimony rests solely with the finder of fact and an appellate court may not substitute its own judgment for that of the finder of fact." *State v. Awan*, 22 Ohio St.3d 120, 123 (1986). To reverse the judgment of a trial court on the weight of the evidence based upon a jury's verdict, a unanimous concurrence of all three

judges on the reviewing panel is required. *Thompkins,* at paragraph four of the syllabus.

**{¶30}** Both of the detectives were present when the CI was thoroughly searched before and after she went to Moorer's apartment, and they testified that they followed the typical protocol. Because the CI was a female, the detective used the back of his hand to pat her down, but he searched her thoroughly and required that she turn all her pockets inside out. Detective Joseph testified that he was confident that the CI did not have any cocaine on her prior to either of the two operations, and she did not have the money that had been given to her afterwards. (Tr. 176-177.) Detective Armstrong, who was also present when the CI was searched, testified as follows:

> Q. Detective Armstrong, are you confident in the searches that the Drug Task Force does, that in this case, the confidential informant had no cocaine prior to going to either of the operations?
>
> A. Yes. I am confident of that.

(Tr. 266.) The Detective also explained that they do not send an officer to personally go in with a CI because it would not be feasible and would basically jeopardize the entire investigation. (*Id.*)

**{¶31}** Both Detectives testified that the CI went into Moorer's apartment with money and no cocaine, and returned shortly thereafter, with cocaine and no money. The CI testified that she had phoned Moorer to arrange to purchase the

drugs, that she went to his apartment, and that she bought the cocaine on two occasions.

{¶32} We acknowledge the quality of the audio and video recordings from inside the apartment during the transactions were not good. The CI apparently had the recording equipment in her purse, and her movements and the angle of the camera caused most of the video from inside the apartment to be jerky and to consist of higher shots of the room and ceiling, and only briefly catching glimpses of Moorer and the other occupants. However, given the nature of the transactions, and the risks involved to the CI, it is understandable that it would have been difficult to plan and control what was being filmed. The detective's videos and the CI's videos definitely show her entering Moorer's apartment. The CI's videos show Moorer in the apartment and show him close enough to her at times to have enabled an exchange of the drugs for the money. The CI testified that is what occurred.

{¶33} Two experienced law enforcement officers and the confidential informant all presented strong and consistent testimony that would support the jury's findings that Moorer was guilty of trafficking in the drugs. And, their testimony was further reinforced by the recordings of the drug transactions and by a considerable amount of additional evidence.

{¶34} Although Moorer's friend testified that he did not *see* any exchanges take place, that is not proof that they did not occur. McDonald testified that he was watching TV when the CI came. Also, both of the visits/transactions were quite brief, and it is understandable that Moorer might not have wanted to make it blatantly obvious that he was selling drugs to the "visitor" in front of his young son and McDonald. The jury might have also mistrusted McDonald's motivations and found the CI to be more believable. Although Moorer challenges the CI's credibility because she has had prior arrests and convictions, McDonald confirmed that he also had a police record. McDonald could not answer the State's questions on cross-examination as to why this young woman would just come to the apartment, stay for a very brief time, and then leave, without apparently any reason or doing anything that would explain a logical purpose for the visits. McDonald claimed he never asked Moorer about the unusual visits.

{¶35} After a review of the entire record, we find that the weight of the evidence supported the jury's verdict. We do not find that the jury lost its way or that its verdict was a manifest miscarriage of justice. Accordingly, we overrule Moorer's second assignment of error.

{¶36} In addition to Moorer's assignments of error, we *sua sponte* address plain error in the trial court's order of restitution to the METRICH Drug Task Force. To have plain error under Crim.R. 52(B), there must be an error that is

"obvious" and that affects "substantial rights." *State v. Barnes*, 94 Ohio St.3d at 27 . Plain error is to be used "with the utmost caution, under exceptional circumstances and only to prevent a manifest miscarriage of justice." *Id.*

{¶37} R.C. 2929.18 governs a trial court's authority to order restitution. It provides, in relevant part, as follows:

> Financial sanctions may be imposed pursuant to this section, including, but not limited to, the following:
>
> Restitution by the offender to the victim of the offender's crime or any survivor of the victim, in an amount based on the victim's economic loss. R.C. 2929.18(A)(1).

{¶38} In *State v. Dietrich*, 3d Dist. No. 1-10-76, 2011-Ohio-4347, we addressed a similar factual scenario in which the trial court imposed restitution to a drug task force after it had conducted a controlled drug purchase targeting the defendant. There, we found that "a governmental entity advancing its own funds to pursue a drug buy through an informant" is not a victim under R.C. 2929.18(A)(1). *Id.* at ¶ 31. Accordingly, we found plain error and vacated the trial court's restitution order.

{¶39} Here, the trial court ordered Moorer to "pay restitution in the amount of $284.50 to the Seneca County Drug Task Force METRICH Enforcement Unit." (Apr. 30, 2012 J.E.) Under *Dietrich*, the trial court was not authorized to issue this order since METRICH is not a victim under R.C. 2929.18(A)(1). As a result, it

was plainly erroneous for the trial court to order restitution to benefit METRICH and we consequently vacate the restitution award.

{¶40} Having found no error prejudicial to the Appellant herein in the particulars assigned and argued in his first and second assignments of error, but having found plain error in the trial court's award of restitution to the METRICH Drug Task Force, we affirm in part, and reverse in part, the judgment of the trial court.

*Judgment Affirmed in Part*
*and Reversed in Part*

**ROGERS and SHAW, J.J., concur.**

**/jlr**