[Cite as *State v. Hardy*, 2024-Ohio-1107.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HENRY COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    v.

THOMAS J. HARDY,

    DEFENDANT-APPELLANT.

CASE NO. 7-23-10

**O P I N I O N**

**Appeal from Henry County Common Pleas Court**
**Trial Court No. 22 CR 0100**

**Judgment Affirmed**

**Date of Decision:  March 25, 2024**

**APPEARANCES:**

    *Austin C. Buchholz* **for Appellant**

    *Gwen Howe-Gebers* **for Appellee**

**WILLAMOWKSI, P.J.**

{¶1} Defendant-appellant Thomas Hardy ("Hardy") brings this appeal from the judgment of the Henry County Court of Common Pleas finding him guilty of one count of rape and sentencing him to prison. Hardy challenges the conviction claiming that it was not supported by sufficient evidence and was against the manifest weight of the evidence. For the reasons set forth below, the judgment is affirmed.

{¶2} On July 27, 2022, the Henry County Grand Jury indicted Hardy on one count of rape in violation of R.C. 2907.02(A)(2), (B), a felony of the first degree. A jury trial was held on May 18 and 19, 2023. At trial, the following testimony was presented.

{¶3} The victim in this case testified that in June of 2021, she had been at a party with her family members and Hardy. Afterwards, Hardy and the victim's sister, who was Hardy's fiancé at that time, took the victim back to their home. The victim admitted that on the night of the alleged rape, she had been drinking. The victim went into a bedroom and began texting with a friend when Hardy entered the room and started kissing her. The victim testified that she attempted to push Hardy away, but he did not stop. Hardy then pulled down her shorts and inserted his penis into her vaginal cavity. Hardy then flipped her onto her stomach and inserted his penis into her vaginal cavity again. The victim indicated that Hardy ejaculated onto

her body. Afterwards, Hardy pulled up his shorts and left the room. The victim then texted her friend that something had happened and changed from pink and white shorts into blue and white shorts. The victim indicated that although she did not say anything while the alleged rape was occurring, she was crying. The victim later went home and put the shorts in a bag.

{¶4} In April of 2022, the victim was babysitting for Hardy and her sister. Once everyone returned to the house, the victim was sleeping on the couch in the living room. Hardy came into the living room and attempted to touch her, but the victim pushed him away. The victim then texted her brother who called the victim's parents. The victim's parents then came to get the victim. The victim admitted that she did not tell her parents everything that had happened until after the police arrived. After speaking with the police, the victim turned over the shorts. The victim identified the shorts as exhibits 1 and 1A during the trial. The victim testified that she did not wish to engage in sexual conduct with Hardy and the intercourse was not voluntary. The victim also indicated that when the alleged rape began she tried to push him away.

{¶5} On cross-examination the victim stated that she did not remember giving a statement to the doctor at the hospital, just that the doctor performed an exam. The victim admitted to having two or three drinks and smoking marijuana at the party before the alleged rape. The victim testified that she was drinking shots of a clear liquid. Before the victim reached Hardy's home, she was getting sick

because of drinking too much. The victim testified that she borrowed the blue and white shorts from her sister. When Hardy entered the bedroom, the victim was wearing the pink and white shorts. When questioned about the penetration, the victim admitted that she had previously stated she did not know if there was penetration. However, the victim testified that she was sure there was penetration, but not sure if it was vaginal or anal. The victim also admitted that she did not cry out when Hardy began assaulting her. The only person the victim told at that time was a friend. The shorts sat in a corner of the victim's room for the months between when the alleged rape occurred and when the victim told her parents.

{¶6} Kaitlyn S. ("Kaitlyn") testified that she and the victim are "best friends." In April of 2022, the victim sent Kaitlyn a text message telling her that Hardy "was trying to make a move on [the victim] and [the victim] was uncomfortable and wanted somebody to call her so that he would stop." Tr. 184. Kaitlyn was not able to call because it was late. Eventually, the victim called her brother and her family went to Hardy's home. Prior to that night, the victim had told Kaitlyn about the alleged rape the morning after it happened, indicating that Hardy had raped the victim. Kaitlyn told the victim to keep her clothes as evidence. The victim had also told another friend of theirs. After the alleged rape, the victim's behavior changed and she seemed to stop caring about herself. Once Hardy was arrested, the victim seemed to be more herself. On cross-examination Kaitlyn testified that the text messages from the victim were sent on Snapchat and were

automatically erased. The victim's original statements about Hardy occurred in the summer of 2021.

{¶7} Deputy Logan Clevidence ("Clevidence") of the Henry County Sheriff's Department testified he received items of clothing from the victim's mother. The clothing was identified as two pairs of shorts – one pink and white and the other blue and white. Clevidence testified that the shorts were both in the same bag.

{¶8} Khalia L. ("Khalia") testified that she was Hardy's fiancé at the time in question and was the victim's sister. On the night in question, Khalia, Hardy, and the victim were at a party to celebrate her father's business. When the party ended, Khalia drove the victim and Hardy back to the house. At her home, the victim went into the kids bedroom while Khalia and Hardy went into the master bedroom. Khalia testified that neither pair of shorts that the victim wore belonged to Khalia. On the night the rape was alleged to have occurred, the victim did not wake her up and she did not hear anything.

{¶9} In April of 2022, the victim was again at Khalia's home and was sleeping on the couch. When Khalia woke up, the victim told her what Hardy had done. Khalia then took the victim to the garage to wait while Khalia went inside to speak with Hardy. Hardy denied doing anything. Khalia called 9-1-1. On cross-examination Khalia testified that on the night of the alleged rape, Hardy went to bed

at the same time she did. She did not hear anything in the night. The day after the alleged rape, the victim did not say anything to Khalia.

{¶10} Doctor Randall Scott Schlievert ("Schlievert") testified that he was a child abuse pediatrician in Toledo, Ohio. On June 1, 2022, Schlievert examined the victim. The victim told Schlievert that Hardy had raped her. When asked why she disclosed the alleged rape at that time after remaining silent for so long, the victim stated it was because Hardy had tried to kiss her again. The physical examination of the victim showed nothing abnormal, which was to be expected given the history provided. On cross-examination, Schlievert testified that the exam results do not indicate one way or the other that a rape occurred.

{¶11} Deputy Blake Musshel ("Musshel") of the Henry County Sheriff's Department testified that he responded to a call on April 24, 2022, regarding a possible sexual assault. Upon his arrival, Musshel made contact with the victim and her mother. The victim was crying and emotional and her mother was hugging her. Musshel also spoke with Hardy who claimed that the victim's parents made it up because they did not like him. Hardy denied the allegations.

{¶12} Andrea B. ("Andrea") testified that she is the mother of the victim. Andrea testified that in June 2021, there was a party at her husband's business that was attended by Hardy and the victim along with other members of the family, employees, and customers. Andrea admitted that she knew the victim was drinking that night. Andrea did not find out for almost a year that something had occurred

between the victim and Hardy. The night of the alleged rape, the victim called Andrea asking to be picked up because she did not feel good. Eventually, the victim indicated that she would be fine until morning when Khalia brought her home. The morning the victim came home she started bleeding and asked Andrea why it was happening. Andrea thought it was just the victim starting her period, but the bleeding stopped after a few hours. Andrea chalked it up to just spotting and did not give it any more thought.

{¶13} In April of 2022, Andrea's son called her at around four in the morning about the victim. Andrea, along with her husband, left immediately to go to the victim without even bothering to get out of her pajamas. Andrea drove and tried to get there as fast as possible. Andrea learned that the victim had kept the clothing the victim wore in June of 2021 in her closet following the alleged rape. When they returned to their home, Andrea and the victim retrieved the bag of clothing from the victim's closet and took the bag to the police. Before June 2021, the victim was described as spunky and outgoing. After June 2021, the victim became quiet and withdrawn. The victim's grades went from being straight As to C's and lower. Andrea testified that since June of 2021, the victim had lost substantial weight. On cross-examination, Andrea admitted that she did not suspect sexual assault when the victim's behavior changed. The victim did not tell Andrea because she was afraid.

{¶14} Detective Sergeant Arlen Cohrs ("Cohrs") testified that he is a certified Master Criminal Investigator and was trained in conducting forensic interviews with juveniles. According to Cohrs, it is common for victims of sexual assault to delay disclosure. Cohrs listened to the forensic interview conducted with the victim and found her demeanor to be quiet and emotional. Cohrs testified that teens like to communicate with friends on Snapchat because the conversation disappears and it is not easily retrieved. Cohrs also testified that there had been no probable cause to obtain a warrant for Hardy's phone. When Andrea dropped off the shorts, the evidence was placed in a temporary locker before being taken to the Ohio Bureau of Criminal Investigation ("BCI"). In addition to the shorts, DNA samples from Hardy and the victim were submitted for comparison. Cohrs identified exhibits 6 and 7 as the reports from BCI regarding the shorts. On cross-examination, Cohrs admitted that he did not put his attempt to speak with Hardy in his report because he was unable to make contact. Cohrs testified that Hardy voluntarily gave a DNA sample.

{¶15} Emily Feldenkris ("Feldenkris") testified that she is a forensic scientist in the DNA section at BCI. Feldenkris conducted the testing in this case. On the blue and white shorts, a test for semen was conducted and the result was positive. However, the sample on those shorts was too small to allow for comparisons. The pink and white shorts were also positive for semen. That sample indicated a mixture of the victim's DNA and a DNA profile consistent with Hardy. "[I]n particular that

DNA profile was located in the sperm fraction of [the] testing." Tr. 323. Feldenkris testified that the "estimated frequency of occurrence of the DNA profile that was observed in the sperm fraction of that profile was rarer than 1 in 1 trillion unrelated individuals." Tr. 329. On cross-examination, Feldenkris admitted that she did not know with 100% certainty that the DNA came from Hardy's semen, but it was "highly likely" given the strength of the profile and the biology results. Although a microscopic evaluation could be done to verify it was actually semen, BCI skips that and goes directly to the DNA results which do not change. According to Feldenkris, the extraction method used was developed to isolate sperm cells, and in her experience other substances to not behave the same way as sperm cells when DNA is extracted.

{¶16} After this testimony, the State moved to admit its exhibits and then to rest. Hardy's counsel then moved for a Criminal Rule 29 motion for judgment of acquittal. The State argued that given the testimony of the victim and the DNA information showing that there was a 1 in 1 trillion chance of the contributor of the sperm faction being anyone other than Hardy, the State had met its burden of making a prima facia case. The trial court agreed and overruled Hardy's motion. Hardy then presented his case.

{¶17} Julie Heinig ("Heinig") testified that she works at the DNA Diagnostic Center in Fairfield, Ohio. Heinig testified that part of her job is to perform case reviews, primarily for defense attorneys, to make sure the State's testing was done

correctly. Heinig was hired to review the processes and opinions rendered by Feldenkris in this case. According to Heinig, BCI should have tested for sperm cells specifically rather than just the DNA. Heinig testified that the DNA could have come from anything, such as sweat and saliva as well as semen and sperm. Without the separate tests, the only conclusion that can be made is that male DNA was present, not that it came from sperm. On cross-examination Heinig admitted that her center did not conduct the tests she alleged BCI should have done. Heinig also agreed that the findings in Feldenkris's report were accurate and that the male DNA with sperm fraction was found in the crotch area of the victim's shorts.

{¶18} Hardy took the stand in his own defense and testified that in April of 2022, he did not interact with the victim as he was outside with a friend before entering the house and going to bed. Hardy stated that when he went in the house, the victim, Khalia, and the children were sleeping in the living room. The next thing he remembers is being woken up by Khalia telling him that the victim claimed he had tried to kiss her and that her parents were coming with a gun. Hardy told Khalia to call the police and she did. The police asked Hardy if he had tried to kiss the victim and he denied it. Eventually the officers started to ask about the alleged rape in 2021. Hardy denied that he had raped the victim or that any sexual conduct had occurred between he and the victim.

{¶19} When questioned about the alleged rape in 2021, Hardy admitted that he went to the party with Khalia. Hardy admitted that he had been drinking and was

slightly intoxicated, but denied being drunk. The victim had been drinking and smoking marijuana at the party. Hardy described her as drunk by the end of the evening. When Hardy left the party with Khalia, the victim went with them. During the drive to their home, the victim started vomiting on herself and the car. Then the car broke down and they had to wait for the tow truck. Soon after, a police car stopped beside them to see if they needed help and the officer remained until after the tow truck left and they were ready to leave with a family member. Hardy denied sexually assaulting the victim in the rear of the vehicle as was claimed by the victim.

{¶20} Once they arrived at the home, Khalia took the victim into the bathroom to get her cleaned up. Hardy testified that he went outside to help clean up the vehicle after the victim had been sick in it again. When Hardy went inside, the victim was already in the children's bedroom and Hardy went to his room. Hardy changed into shorts and a t-shirt and then went to bed with Khalia. Hardy denied going into the other bedroom or any interaction with the victim on that night. Hardy claimed that the shorts in question here have been in his laundry before and Khalia would wear the victim's clothing at times. Hardy testified that in his opinion, his DNA was found on the victim's shorts from when he "did them in the laundry" because he folds the clothes. When asked how his sperm fracture appeared in the crotch area of the shorts, Hardy indicated that he had no idea.

{¶21} Following Hardy's testimony, the defense rested its case. Closing arguments were made and the jury was given its instructions before leaving to

deliberate. Hardy did not renew his Criminal Rule 29 motion. The jury returned a verdict of guilty as to the charge of rape. On July 7, 2023, the trial court sentenced Hardy to an indefinite prison term of 9 to 13½ years. Hardy appeals from this judgment and raises the following assignments of error.

## First Assignment of Error

**[Hardy's] conviction was not supported by sufficient evidence presented at trial.**

## Second Assignment of Error

**[Hardy's] conviction was against the manifest weight of the evidence presented at trial.**

## Third Assignment of Error

**The trial court erred by failing to grant a judgment of acquittal, pursuant to Crim.R. 29(A) on the rape charge and thereafter entering a judgment of conviction on this offense [that] was not supported by sufficient evidence.**

*Sufficiency of the Evidence*

{¶22} In the first and third assignments of error, Hardy alleges that his conviction was not supported by sufficient evidence. This Court recognizes that Hardy failed to renew his Criminal Rule 29 motion at the conclusion of the case and this would usually, absent plain error, result in a waiver of appeal on the issue. *State v. Brentley*, 3d Dist. Allen Nos. 1-22-61 and 1-22-60, 2023-Ohio-2530 (failure to renew a Crim.R. 29(A) motion at the conclusion of all evidence waives all but plain error on appeal). However, in this case Hardy also claims in the first assignment of

error that the conviction is not supported by sufficient evidence.  Since the analysis

are identical, we will address the third assignment of error as well.

> A sufficiency analysis "'determine[s] whether the case may go to the jury or whether the evidence is legally sufficient to support the jury verdict as a matter of law.'" *State v. Thompkins*, 78 Ohio St.3d 380, 386, 678 N.E.2d 541 (1997), quoting Black's Law Dictionary 1433 (6th Ed.1990). If the state fails to present sufficient evidence on every element of an offense, then convicting a defendant for that offense violates the defendant's right to due process of law. *Id.* at 386-387, 678 N.E.2d 541; see also *Jackson v. Virginia*, 443 U.S. 307, 316, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979).

*State v. Messenger,* 171 Ohio St.3d 227, 2022-Ohio-4562, ¶ 13, 216 N.E.3d 653.

The question of whether the evidence presented at trial is legally sufficient to

support a verdict is a question of law and questions the adequacy of the evidence.

*State v. Hulbert*, 3d Dist. Van Wert No. 15-19-07, 2021-Ohio-2298, ¶ 5.  "An

appellate court's function when reviewing the sufficiency of the evidence to support

a criminal conviction is to examine the evidence admitted at trial to determine

whether such evidence, if believed, would convince the average mind of the

defendant's guilt beyond a reasonable doubt."  *State v. Jenks*, 61 Ohio St.3d 259,

574 N.E.2d 492 (1991) superseded by constitutional amendment on other grounds.

Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light

most favorable to the prosecution, any rational trier of fact could have found the

essential elements of the crime proven beyond a reasonable doubt." *Id.*  "In deciding

if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the

credibility of witnesses, as both are functions reserved for the trier of fact." *State v. Jones*, 1st Dist. Hamilton No. C-120570, 2013Ohio-4775, ¶ 33.

**{¶23}** Here, the State was required to prove that Hardy 1) engaged in sexual conduct with another while 2) purposely compelling the person to submit by force. R.C. 2907.02(A)(2). "Sexual conduct" includes vaginal intercourse as part of its definition. R.C. 2907.01(A). "Force" is defined as "any violence, compulsion, or constraint physically exerted by any means upon or against a person or thing." R.C. 2901.01. In determining whether force is present, the key inquiry is whether the victim's will was overcome by fear or duress. *State v. Stevens*, 3d Dist. Alen No. 1-14-58, 2016-Ohio-446, ¶ 20, 58 N.E.3d 584.

**{¶24}** Here, the victim was a 14 year old girl and Hardy was the fiancé of her older sister. The victim testified that Hardy came into the room and started kissing her. She attempted to push him away, but he did not stop. The victim testified that Hardy then pushed down her shorts and put his penis into her vagina. This testimony is evidence of sexual conduct. The victim also testified that she was crying and Hardy did not stop. Given the age of the victim, the relationship between the victim and Hardy, and his failure to stop when she tried to push him away, a reasonable juror could find that Hardy had engaged in force sufficient to overcome her will by fear or duress. Viewing the evidence in a light most favorable to the State, it was sufficient to support a conviction for rape. The first and third assignments of error are overruled.

*Manifest Weight of the Evidence*

**{¶25}** Hardy claims in his second assignment of error that his conviction was against the manifest weight of the evidence.

> When reviewing a judgment to determine if it is against the manifest weight of the evidence, an appellate court "review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Mendoza*, 137 Ohio App.3d 336, 738 N.E.2d 822 (2000). See, also, *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A new trial should be granted only in the exceptional case in which the evidence weighs heavily against conviction. Thompkins at 387, 678 N.E.2d 541. Although the appellate court acts as a "thirteenth juror," due deference to the findings made by the fact-finder must still be given. *State v. Moorer*, 3d Dist. 13–12–22, 2013-Ohio-650, 2013 WL 684735, ¶ 29.

*Hulbert*, *supra* at ¶ 23.

**{¶26}** Hardy claims that his conviction is against the manifest weight of the evidence because the testimony of the victim lacks credibility and the evidence presented by Hardy was more credible. In this case, the only two people who knew for sure what happened in that room were Hardy and the victim. The victim testified that Hardy raped her. Hardy denied that he was even in the room. However, this was not all the evidence. The DNA tests showed an indication that there was sperm found in the shorts of the victim. The two DNA profiles were identified as belonging to the victim and Hardy. The results showed that the odds of the male DNA belonging to someone other than Hardy were 1 in a trillion. Although Hardy

presented his own expert who testified that BCI should have conducted additional tests to verify the male DNA came from the sperm cells and not another bodily fluid, the expert agreed that the preliminary testing indicated that sperm was present and that further testing identified the male DNA as belonging to Hardy. When questioned on cross-examination, Hardy claimed his DNA was found because he folded the laundry. However, he had no answer as to how sperm was found in the victim's shorts and only two DNA contributors were found with one being the victim and the other being him. A review of the record before this Court does not show that the jury clearly lost its way, that the evidence weighs heavily against conviction, or that a manifest miscarriage of justice occurred. Thus, the conviction is not against the manifest weight of the evidence and the second assignment of error is overruled.

{¶27} Having found no prejudicial errors in the particulars assigned and argued, the judgment of the Henry County Court of Common Pleas is affirmed.

*Judgment Affirmed*

**WALDICK and MILLER, J.J., concur.**

**/hls**