[Cite as *State v. Hulbert*, 2021-Ohio-2298.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## VAN WERT COUNTY

STATE OF OHIO,

    PLAINTIFF-APPELLEE,

    CASE NO. 15-19-07

    v.

TINA M. HULBERT,

    O P I N I O N

    DEFENDANT-APPELLANT.

Appeal from Van Wert County Common Pleas Court
Trial Court No. CR-18-07-116

**Judgment Affirmed**

**Date of Decision:  July 6, 2021**

APPEARANCES:

    *Clayton J. Crates* **for Appellant**

    *Kelly J. Rauch* **for Appellee**

**WILLAMOWSKI, P.J.**

{¶1} Defendant-appellant Tina M. Hulbert ("Hulbert") brings this appeal from the judgment of the Court of Common Pleas of Van Wert County accepting the guilty verdicts of the jury on two counts of theft from an elderly person or disabled adult and six counts of forgery. Hulbert claims on appeal that the trial court erred by denying her Criminal Rule 29 motions, that the convictions are not supported by sufficient evidence, and that the convictions were against the manifest weight of the evidence. For the reasons set forth below, the judgment is affirmed.

*Facts and Procedural Background*

{¶2} Hulbert was employed at Van Wert Manor ("the Manor"), which is operated by HCF Management ("HCF"), as the office manager for several years. In 2016, Hulbert's supervisor, Jackie O'Kief ("O'Kief") was out and Jodi Bennett ("Bennett") was brought in to cover for O'Kief. Bennett noticed several irregularities in the books and brought the matter to the attention of her supervisor, the regional manager for HCF, Tara Sibert ("Sibert"). Sibert then notified the corporate staff and they began going through the records where more discrepancies in the accounts were found. These discrepancies included such items as lateral transfers from one patient's account to another patient's account, which is prohibited by HCF policy, missing cash funds from patient's accounts (i.e. cashing a check made out to a resident for $6,000, but only crediting the resident's account with $5,000), accepting cash payments for services not rendered, and checks that

appeared to be forged. In one case, the review showed a check being cashed for $513, but the money was not deposited into the resident's account. Instead, $513 was transferred from another resident into the first resident's account. Hulbert was brought in for questioning and indicated that she did not know how it could have happened. HCF suspended Hulbert while the corporate office pulled the records and began an audit. Eventually HCF made a report to the police and to the state. An internal investigation was conducted at the same time as the criminal investigation with the results of the internal investigation being provided to the police.

{¶3} On July 12, 2018, the Van Wert County Grand Jury indicted Hulbert on the following counts: 1) Theft from an Elderly Person or Disabled Adult in violation of R.C. 2913.02(A)(1), (B)(3) for theft from multiple residents of Van Wert Manor with a specification that the value stolen was between $37,500 and $150,000, a felony of the second degree; 2) Forgery against Beth Cobb ("Cobb") in violation of R.C. 2913.31(A)(1), (C)(1)(c)(i) with a specification that the victim was elderly and the value of the property was between $1,000 and $7,500, a felony of the fourth degree; 3) Forgery against David Chehi ("Chehi") in violation of R.C. 2913.31(A)(1), (C)(1)(c)(i) with a specification that the victim was elderly and the value of the property was between $1,000 and $7,500, a felony of the fourth degree; 4) Forgery against Dorothy Kohler ("Kohler") in violation of R.C. 2913.31(A)(1), (C)(1)(c)(i) with a specification that the victim was elderly and the value of the

property was between $1,000 and $7,500, a felony of the fourth degree; 5) Forgery against Helen Ferrell ("Ferrell") in violation of R.C. 2913.31(A)(1), (C)(1)(c)(i) with a specification that the victim was elderly and the value of the property was between $1,000 and $7,500, a felony of the fourth degree; 6) Forgery against Frances Thor ("Thor") in violation of R.C. 2913.31(A)(1), (C)(1)(c)(i) with a specification that the victim was elderly and the value of the property was between $1,000 and $7,500, a felony of the fourth degree; 7) Forgery against Marilyn Kwascigroh ("Kwascigroh") in violation of R.C. 2913.31(A)(1), (C)(1)(c)(i) with a specification that the victim was elderly and the value of the property was between $1,000 and $7,500, a felony of the fourth degree; 8) Forgery against William Williams ("Williams") in violation of R.C. 2913.31(A)(1), (C)(1)(c)(i) with a specification that the victim was elderly and the value of the property was between $1,000 and $7,500, a felony of the fourth degree; and 9) Theft from an Elderly Person or Disabled Adult for theft from Betty Schumm ("Schumm") in violation of R.C. 2913.02(A)(1), (B)(3) with a specification that the value of the property was less than $1,000, a felony of the fifth degree. Doc. 2. Hulbert entered pleas of not guilty to all of the charges. Doc. 9. The trial court scheduled a jury trial for August 2019. Doc. 67. Prior to the trial, the parties entered stipulations as to the authenticity and admissibility of State's Exhibits 1-7 and Defense Exhibits A-I. Doc. 86-87. The trial was held from August 12-15, 2019. During the trial, the trial court dismissed County 6 of the indictment. Doc. 127. The jury returned verdicts

of guilty on all the remaining counts as charged in the indictment, including the specifications. Doc. 96.

{¶4} On September 25, 2019, the trial court held a sentencing hearing. Doc. 119. The trial court determined that Counts 4 and 8 were included in Count 1 and were thus subject to merger. Doc. 119. The State elected to proceed with sentencing on Count 1. Doc. 119. The trial court then ordered that Hulbert serve a prison term of five years on Count 1, 14 months as to Count 2, 14 months as to Count 3, 14 months as to Count 5, 11 months as to Count 7, and 11 months as to Count 9. Doc. 119. The terms were ordered to be served concurrently for an aggregate prison term of five years. Doc. 119. Hulbert filed a timely notice of appeal from this judgment. Doc. 131. On appeal, Hulbert raises the following assignments of error.

**First Assignment of Error**

**The trial court committed prejudicial error by denying [Hulbert's] Rule 29 motion as to Count One of the indictment.**

**Second Assignment of Error**

**The trial court committed prejudicial error by denying [Hulbert's] rule 29 motion as to Counts Two through Five and Counts Seven and Eight.**

**Third Assignment of Error**

**[Hulbert's] convictions were not supported by legally sufficient evidence.**

**Fourth Assignment of Error**

**[Hulbert's] convictions were against the manifest weight of the evidence.**

Due to the overlapping of the first, second, and third assignments of error, they will be addressed together.

*Criminal Rule 29 and Sufficiency of the Evidence*

{¶5} In the first two assignments of error, Hulbert claims that the trial court erred in denying her Criminal Rule 29 motions. Criminal Rule 29(A) provides that the "court on motion of a defendant or on its own motion, after the evidence on either side is closed, shall order the entry of a judgment of acquittal of one or more offenses charged in the indictment * * * if the evidence is insufficient to sustain a conviction of such offense or offenses." Thus, the standard of review for a denial of a Criminal Rule 29 motion is the same as the standard of review for a sufficiency of the evidence claim. *State v. Carter*, 72 Ohio St.3d 545, 553, 1995-Ohio-104, 651 N.E.2d 965. The question of whether the evidence presented at trial is legally sufficient to support a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541. Sufficiency is basically a term of adequacy. *Id*.

> **An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. * * * Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light**

**most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." * * * "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact."**

*State v. Adkins*, 3d Dist. Allen No. 1-19-71, 2020 -Ohio- 6799, ¶ 37 (citations omitted).

**{¶6}** In the first assignment of error, Hulbert claims that the evidence was insufficient to support a conviction on Count 1. Count 1 stated that Hulbert had violated R.C. 2913.02(A)(1), (B)(3). To prove this offense, the state had to show that Hulbert 1) knowingly 2) obtained control over the money 3) with the purpose to deprive the owner of the property 4) without the consent of the owner, 5) that the victims were elderly or disabled adults, and 6) that the value of the property stolen was between $37,500 and $150,000. A disabled adult is defined as "a person who is eighteen years of age or older and has some impairment of body or mind that makes the person unable to work at any substantially remunerative employment that the person otherwise would be able to perform and that will, with reasonable probability, continue for a period of at least twelve months without any present indication of recovery from the impairment, or who is eighteen years of age or older and has been certified as permanently and totally disabled by an agency of this state or the United States that has the function of so classifying persons." R.C.

2913.01(DD). An elderly person is one who is 65 years of age or older. R.C. 2913.01(CC).

{¶7} In this case, Jacque Welch ("Welch") testified that she was the administrator at the Manor. Tr. 366-67. Hulbert was the business office manager and was the one responsible for collecting residents' payments, making bank deposits, managing the balance of the resident trust accounts, and managing the internal funds for the residents. Tr. 372, 390. This process was done through the PointClickCare ("PCC") system and each person has an individual password that is not shared with others. Tr. 377, 381. Hulbert was responsible for providing quarterly resident trust statements to residents or their representatives, but Welch learned after Hulbert's termination that this was not being done. Tr. 397. Welch testified that when a resident wanted money from the individual account, the resident or a family member should sign either the withdrawal form or a receipt to justify the withdrawal. Tr. 400. The office manager should also sign the receipt and all receipts were to be kept in a binder for tracking. Tr. 401. If no receipt for the money was provided, the withdrawal form should still be signed by the resident or his/her representative. Tr. 403. Welch testified that Hulbert was responsible for reporting any issues with a patient withdrawing too much money or any transactions that were out of the ordinary. Tr. 404. According to Welch, the corporate office began investigating Hulbert when a lateral transfer was found in the account of resident Bonnie Clemens ("Clemens") because lateral transfers are not permitted

between resident accounts. Tr. 409-410. Welch testified that after Hulbert was terminated, she mailed out trust statements and many families notified her they had never seen them before and questioned the withdrawals listed on them. Tr. 419.

{¶8} Amber Showalter ("Showalter") Showalter testified that she was a licensed social worker employed by the Manor for 17 years. Tr. 469. As part of her job, Showalter had direct and frequent contact with the residents. Tr. 470. Showalter indicated that she, in her capacity as social worker at the Manor, sometimes takes money from the cash box for the resident to make requested purchases, but always turns in the change and the receipts. Tr. 472. Showalter also testified that Hulbert never notified her that there were any missing funds from the cash box. Tr. 473. Showalter indicated that she was familiar with many of the residents at the Manor. Tr. 474-75. She specifically noted that resident Craig Gunsett ("Gunsett") suffered from severe cognitive impairment, as he was unable to answer any of the questions correctly and scored a zero on the testing. Tr. 481-82, 484. She indicated that Clemens was totally dependent on the staff for care and suffered from severe cognitive deficits. Tr. 486. According to Showalter, Williams had poor short term memory and while he may knew the staff and where he was, he would not know such basic information as what day it was. Tr. 488. Showalter testified that Williams did not speak much and kept to himself. Tr. 487. When asked about PCC, Showalter testified that she has access to PCC, but not to the

resident trust accounts and she can only gain access to PCC through her own passwords. Tr. 494.

{¶9} Sibert testified that she was the regional manager for HCF and oversees the Manor, including the finances. Tr. 524-25. According to Sibert, each employee has an individual password for PCC, which needs to be changed routinely. Tr. 530-31. Only the home office has access to everyone's individual passwords. Tr. 532. Sibert testified that Hulbert was a trusted employee who oversaw all the cash that came into the Manor, both for the Manor and the residents. Tr. 533-34. Hulbert was the one responsible for all deposits and inputting the data to the accounts. Tr. 543. Sibert first learned there were issues with the accounts when Bennett took over managing the Manor's books while O'Kief was out.[1] Tr. 542. As Sibert and Bennett began looking into the accounts, they found more discrepancies, notified HCF corporate staff, and called Hulbert in for a meeting. Tr. 543. Sibert asked Hulbert to explain the lateral transfers that were done in PCC under Hulbert's password and Hulbert said she did not know how it could have happened. Tr. 544. Sibert then began an internal audit and eventually called the police. Tr. 545. Sibert identified Ex. 5 as a summary of the internal investigation. Tr. 548.

{¶10} Bennett testified that she went to the Manor because O'Kief was absent and a question was raised regarding some checks written out of the resident

---

[1] Sibert and Bennett gave different reasons for O'Kief's absence. Why she was absent was irrelevant to the case before us.

trust account. Tr. 583-84. While reviewing the books, she noted that there was a lateral transfer in to Clemens' account for $513 from Gunsett's account. Tr. 588. Bennett also noted there was a check for Clemens in the amount of $513 which was cashed, but no deposit of that amount was made into Clemens account. Tr. 588. As Bennett continued to review Clemens account, she saw several lateral transfers. Tr. 590. Bennett identified Ex. 5 as the accounts receivable spreadsheet created and Ex. 4 as the lateral transfers she found during an audit. Tr. 592-94. A review of Ex. 4 states the birthdates of the residents affected. Bennett noted that no birthdate was provided for Williams or Kwascigroh. Tr. 621, 624. She did provide birth dates for several other residents. Tr. 615-624.

{¶11} A review of Exhibits 4, 5, and 6, show that several accounts were missing funds. Some were short funds due to lateral transfers, some due to missing cash deposits, and others due to the issuance of improper checks signed by Hulbert. Of those accounts, there are 49 residents affected for which evidence was provided that they were either over the age of 65 (elderly) or met the statutory definition of disabled.[2] The total amount misappropriated from the accounts of those residents was between the amounts of $37,500 and $150,000.

{¶12} The only issue that did not have supporting testimony to support the conviction was the lack of consent. Hulbert specifically claims that the State failed

---

[2] Testimony was provided about several other residents and evidence was provided about the losses for those people. However, no evidence was presented that those other residents were either elderly or disabled, so this Court will not include them in the review.

to present any evidence that the owners of the property did not give consent to Hulbert to take control of the money. Basically, she is arguing that since she was the office manager, she had the implied consent of the residents to manage their money. However, the jury, without supporting testimony, could infer that the residents did not consent to Hulbert taking their money and giving it either to other residents or to Hulbert, herself. *State v. Swartz,* 6th Dist. Lucas No. L-90-107, 1991 WL 82979 (May 17, 1991). The Ohio Administrative Code sets forth requirements for the management of resident's personal funds by nursing facilities, such as the Manor. Ohio Adm.Code 5160-3-16.5(E).[3]

> **(E) Accounting and records.**
>
> **(1) A NF provider shall establish and maintain a system that ensures full, complete, and separate accounting of each resident's PNA account funds.**
>
> **(2) A NF provider shall not commingle a resident's accounts or funds with the provider's accounts or funds, or with the accounts or funds of any individual other than another NF resident.**
>
> **(3) A NF provider shall provide a resident with access to petty cash (less than fifty dollars) on an ongoing basis and shall arrange for the resident to access larger funds (fifty dollars or more). A NF provider shall give residents a receipt for every transaction, and the NF provider shall retain a copy.**
>
> **(4) A NF provider shall obtain a resident's signature upon the resident's receipt of PNA funds. If the resident is unable to sign his or her name, he or she shall acknowledge receipt of the money by marking an "X." Two persons shall verify through signature that they have witnessed the resident's action.**

---

[3] In this section, "NF" stands for nursing facility and "PNA" stands for patient needs account.

**(5) A NF provider shall maintain an individual ledger account of revenue and expenses for each PNA account managed by the facility. The ledger account shall meet all the following criteria:**

**(a) Specify all funds received by or deposited with the NF provider. For PNA account funds deposited in banks, monies shall be credited to the resident's bank account within three business days; and**

**(b) Specify the dates and reasons for all expenditures; and**

**(c) Specify at all times the balance due the resident, including interest earned as last reported by the bank to the provider; and**

**(d) Be available to the resident or the resident's representative for review.**

**(6) Upon request, a NF provider shall provide receipts to a resident or the resident's representative for purchases made with the resident's PNA funds.**

**(7) Within thirty days after the end of the quarter, a NF provider shall provide a written quarterly statement to each resident or resident's representative of all financial transactions made by the provider on the resident's behalf.**

Pursuant to the regulations, the consent to withdraw money must have a written receipt signed by the resident or representative and at least marked by an X, verified by two people. That did not occur in these cases. Detective Cory Reindel ("Reindel") of the Van Wert City Police Department testified that during his investigation, no residents or their representatives he spoke with indicated there was any consent to Hulbert possessing or moving the funds to third parties. Tr. 215. Showalter testified that several of the residents involved were incapable of giving

consent. Based upon this evidence, the jury could reasonably find that Hulbert committed her actions without the consent of the residents or their representatives.

{¶13} Viewing the evidence in a light most favorable to the State, evidence was presented as to each element of the offense charged in Count 1. The evidence was not insufficient and the first assignment of error is overruled.

{¶14} In the second assignment of error, Hulbert claims that in Counts 2-5, and 7-8, the evidence was not sufficient to support the charges of forgery. To prove a claim of forgery, the State is required to show that 1) Hulbert, 2) knowing that she was engaged in a fraud, 3) forged a writing of another 4) without that person's authority, 5) that the victims were elderly or disabled adults[4], and 6) that the amount affected was between the amounts of $1,000 and $7,500. R.C. 2913.31(A)(1), (C)(1)(c)(i). The statutory definitions of elderly and disabled adults were set forth above.

{¶15} Count 2 alleged that the victim of the forgery was Cobb. Showalter testified that Cobb was severely cognitively impaired due to an accident that caused a severe brain injury and Cobb's parents made most of her decisions. Tr. 490. Although Cobb, who was born in 1966, was not elderly pursuant to the statute, she could be considered a disabled adult under the statutory definition. R.C. 2913.01(DD). Reindel identified Ex. 3 as photocopies of checks that were suspected

---

[4] The requirement of proving that the victim was elderly was not required for Count 7 as that element was dismissed and the Count was amended to be a felony of the fifth degree rather than a felony of the fourth degree.

to be forged. Tr. 204. Along with the checks, Reindel examined sample signatures from the residents taken from the intake paperwork. Tr. 204. Reindel compared the original signatures to the ones on the checks in Ex. 3 and found them to be "obviously different penmanship". Tr. 205. A review of Ex. 3B, pages 54-60, show seven different checks allegedly signed by Cobb, yet there are distinct differences between the signatures and Reindel said they were all different from the sample signatures he reviewed. The total of these checks was $2,400. Reindel also testified that during his investigation, the residents and family members all denied signing the checks or giving Hulbert permission to do so. Tr. 215. From this information, a reasonable juror could find that these checks were signed by someone besides Cobb for a fraudulent purpose and that the amount was between $1,000 and $7,500. Because Hulbert endorsed the checks and cashed them, the jurors could reasonably infer that she was the one responsible. Viewing the evidence in a light most favorable to the State, the evidence is sufficient to support a conviction as to Count 2.

{¶16} Count 3 alleged that the victim of the forgery was Chehi. Showalter testified that she was familiar with Chehi. Tr. 475. Bennett testified that Chehi was born in February of 1948. Tr. 624. Reindel testified that along with the checks, he examined sample signatures from the residents taken from the intake paperwork. Tr. 204. Reindel compared the original signatures to the ones on the checks in Ex. 3 and found them to be "obviously different penmanship". Tr. 205. A review of

Ex. 3B, pages 45-52, show seven different checks allegedly signed by Chehi, yet there are distinct differences between the signatures and Reindel said they were all different from the sample signatures he reviewed. The total of these checks was $3,050. Of the checks that were cashed after Chehi's 65th birthday, a total of $2,250 was missing. Reindel also testified that during his investigation, the residents and family members all denied signing the checks or giving Hulbert permission to do so. Tr. 215. From this information, a reasonable juror could find that these checks were signed by someone besides Chehi for a fraudulent purpose and that the amount was between $1,000 and $7,500. Because Hulbert endorsed the checks and cashed them, the jurors could reasonably infer that she was the one responsible. Viewing the evidence in a light most favorable to the State, the evidence is sufficient to support a conviction as to Count 3.

{¶17} Count 4 claimed that Kohler was the victim of forgery. This Court notes that Count 4 was merged into Count 1 for the purposes of sentencing. When a conviction is merged with another for the purposes of sentencing, there is no longer a conviction to be vacated, so the sufficiency of the evidence to support the conviction need not be addressed as long as the evidence is sufficient to support the selected conviction. *State v. Turner*, 2nd Dist. Clark No. 2017-CA-78, 2019-Ohio-144, ¶ 22. This Court has already held that the evidence was sufficient to support a conviction pursuant to Count 1. Thus, this Court need not address the sufficiency of the evidence as to Count 4.

{¶18} Count 5 alleged that the victim of the forgery was Ferrell. Bennett testified that Ferrell was born in 1920. Tr. 624. This would make her older than 65 for all relevant dates. Reindel testified that along with the checks, he examined sample signatures from the residents taken from the intake paperwork. Tr. 204. Reindel compared the original signatures to the ones on the checks in Ex. 3 and found them to be "obviously different penmanship". Tr. 205. A review of Ex. 3B, pages 77-83, show seven different checks allegedly signed by Ferrell, yet there are distinct differences between the signatures and Reindel said they were all different from the sample signatures he reviewed. The total of these checks was $2,550. Reindel also testified that during his investigation, the residents and family members all denied signing the checks or giving Hulbert permission to do so. Tr. 215. From this information, a reasonable juror could find that these checks were signed by someone besides Ferrell for a fraudulent purpose and that the amount was between $1,000 and $7,500. Because Hulbert endorsed the checks and cashed them, the jurors could reasonably infer that she was the one responsible. Viewing the evidence in a light most favorable to the State, the evidence is sufficient to support a conviction as to Count 5.

{¶19} Count 7 alleged that the victim of the forgery was Kwascigroh. As no evidence was presented showing that Kwascigroh was either elderly or a disabled adult pursuant to the statute, the trial court granted the Criminal Rule 29 motion as to that portion of the indicted charge. Reindel testified that along with the checks,

he examined sample signatures from the residents taken from the intake paperwork. Tr. 204. Reindel compared the original signatures to the ones on the checks in Ex. 3 and found them to be "obviously different penmanship". Tr. 205. A review of Ex. 3B, pages 151-154, show four different checks allegedly signed by Kwascigroh, yet there are distinct differences between the signatures and Reindel said they were all different from the sample signatures he reviewed. The total of these checks was $2,458. Reindel also testified that during his investigation, the residents and family members all denied signing the checks or giving Hulbert permission to do so. Tr. 215. From this information, a reasonable juror could find that these checks were signed by someone besides Kwascigroh for a fraudulent purpose and that the amount was between $1,000 and $7,500. Because Hulbert endorsed the checks and cashed them, the jurors could reasonably infer that she was the one responsible. Viewing the evidence in a light most favorable to the State, the evidence is sufficient to support a conviction as to Count 7.

{¶20} Count 8 claimed that Williams was the victim of forgery. This Court notes that Count 8 was merged into Count 1 for the purposes of sentencing. When a conviction is merged with another for the purposes of sentencing, there is no longer a conviction to be vacated, so the sufficiency of the evidence to support the conviction need not be addressed as long as the evidence is sufficient to support the selected conviction. *Turner, supra*. This Court has already held that the evidence

was sufficient to support a conviction pursuant to Count 1. Thus, this Court need not address the sufficiency of the evidence as to Count 8.

{¶21} This Court finds that the evidence is not insufficient to support the convictions as to Counts 2, 3, 5, and 7. Counts 4 and 8 are allied offense of similar import which merged for the purposes of sentencing and thus the sufficiency of the evidence need not be considered. For these reasons, the second assignment of error is overruled.

{¶22} Hulbert argues in the third assignment of error that her convictions were not supported by sufficient evidence. This Court has already addressed this issue as to Counts 1-5 and 7-8. In Count 9, Hulbert was charged with theft of less than $1,000 from an elderly person in violation of R.C. 2913.02(A)(1), (B)(3). As discussed above, the State had to prove that that Hulbert 1) knowingly 2) obtained control over the money 3) with the purpose to deprive the owner of the property 4) without the consent of the owner, 5) that the victims were elderly or disabled adults, and 6) that the value of the property stolen was less than $1,000. The victim as to Count 9 was Betty Schumm ("Schumm"). In Ex. 3(A), the jury was shown a check dated June 21, 2016, for $800.00 made out to Schumm. The back of the check shows it was allegedly endorsed by Schumm and then by Hulbert. Dennis Schumm ("Dennis") testified that he was the son of Schumm. Tr. 499. He testified that by June of 2016, Schumm had advanced dementia, was incapable of having a conversation, and was incapable of signing anything as she no longer had control of

-19-

her hands. Tr. 504-505. Dennis indicated that the signature on the back of the check was not Schumm's. Tr. 501. At no time did anyone contact him requesting to withdraw the money and he never saw a patient trust account report. Tr. 504. Dennis testified that the money was missing. Tr. 500. Reindel testified that no record of the cash being deposited for Schumm or a receipt for use of the money was found when investigated. Tr. 209. Bennett testified that Schumm was born in 1923, which would have made her 93 years of age at the time the cash from the check was taken. Tr. 623. Bennett also testified that by her calculations, Schumm was missing $787.60. Tr. 623. Viewing this testimony in a light most favorable to the State, the evidence is sufficient to support the conviction. The third assignment of error is overruled.

{¶23} Finally, Hulbert argues that her convictions are against the manifest weight of the evidence. When reviewing a judgment to determine if it is against the manifest weight of the evidence, an appellate court "review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Mendoza*, 137 Ohio App.3d 336, 738 N.E.2d 822 (2000). See, also, *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A new trial should be granted only in the exceptional case in which the evidence weighs heavily against

conviction. *Thompkins* at 387, 678 N.E.2d 541. Although the appellate court acts as a "thirteenth juror," due deference to the findings made by the fact-finder must still be given. *State v. Moorer*, 3d Dist. 13–12–22, 2013-Ohio-650, 2013 WL 684735, ¶ 29.

{¶24} In this case, there were substantial records revealing a number of specific transactions from which a direct inference could be drawn that Hulbert was the one responsible for the missing funds. For example, the receipt for $513 to be deposited in Clemens' account showed Hulbert accepting the check and cashing it, but no deposit to Clemens was ever made. Instead, a lateral transfer was made from the account of another resident in the amount of $513. Hulbert signed the deposit slip and the check and Hulbert's password was the one used to make the lateral transfer. Another instance showed a resident receiving a check for $6,000, which was cashed by Hulbert. However, only $5,000 was deposited into the resident's account. The remaining $1,000 is missing. At approximately the same time, Hulbert's accounts show a cash deposit of $1,000 being made. The jury could reasonably infer that the money was the missing funds. Exhibit 4 shows thousands of dollars in lateral transfers between residents' accounts, all performed under the PCC password of Hulbert. Exhibits 5 and 6 show missing cash from receipts and checks requested by Hulbert for residents which have no documentation as to why they were requested and the funds disappeared. This Court has reviewed all of the exhibits in detail to verify that all of the elements were met. A review of the record

before this Court does not show that the jury clearly lost its way, that the evidence weighs heavily against conviction, or that a manifest miscarriage of justice occurred. Thus, the convictions are not against the manifest weight of the evidence. The fourth assignment of error is overruled.

{¶25} Having found no prejudicial errors in the particulars assigned and argued, the judgment of the Court of Common Pleas of Van Wert County is affirmed.

*Judgment Affirmed*

**SHAW and ZIMMERMAN, J.J., concur.**

**/hls**