[Cite as *State v. Starbird*, 2022-Ohio-3518.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HARDIN COUNTY

STATE OF OHIO,

      PLAINTIFF-APPELLEE,

      v.

MARK MATTHEW STARBIRD,

      DEFENDANT-APPELLANT.

CASE NO. 6-21-08

O P I N I O N

Appeal from Hardin County Common Pleas Court
Trial Court No. CRI 20202146

**Judgment Affirmed**

**Date of Decision: October 3, 2022**

APPEARANCES:

    *Howard A. Elliott* **for Appellant**

    *McKenzie J. Klinger* **for Appellee**

**WILLAMOWSKI, J.**

{¶1} Defendant-appellant Mark M. Starbird ("Starbird") brings this appeal from the judgment of the Court of Common Pleas of Hardin County finding him guilty of endangering children. Starbird alleges on appeal that the trial court erred by admitting the testimony of a witness, that the verdict was based upon an inference upon an inference, that the conviction is not supported by sufficient evidence, and that the conviction is against the manifest weight of the evidence. For the reasons set forth below, the judgment is affirmed.

{¶2} On July 20, 2020, a five-week-old infant, M.S., was taken to the hospital with injuries that allegedly were caused by a fall. Starbird claimed that while bathing M.S., he left him in the baby tub on the bathroom counter while he went to get a clean diaper. Starbird then heard a thump in the bathroom and went back to find the tub and M.S. on the floor, with M.S. crying. Starbird alleged that this was the cause of M.S.'s injuries. At the hospital, M.S. was diagnosed with a broken leg, two broken ribs, and a skull fracture.

{¶3} On December 14, 2020, the Hardin County Grand Jury indicted Starbird on one count of Endangering Children in violation of R.C. 2919.22(B)(1), (E)(2)(d), a felony of the second degree. A jury trial was held on May 18-19, 2021. The following testimony was presented at the trial.

{¶4} Chief Michael Harnishfeger ("Harnishfeger") of the Ada Police Department, testified that he spoke with Starbird on July 21, 2020, after children's

services referred the case to the police. Tr. 83-84. Starbird told Harnishfeger that he was out of the room for a couple of seconds when "he heard a thud and when he went back into the bathroom, he found the baby on the floor and he found the tub on the floor as well." Tr. 86. Starbird told Harnishfeger that he picked up M.S. and, realizing M.S. was hurt, got him ready to go to the hospital. Tr. 86. Starbird indicated that when M.S. fell, his wife ("K.S.") was not home, but she arrived home as he was picking up the baby. Tr. 90. Starbird wrote out a statement about what happened, which was identified as Exhibit 3. Tr 91-92. Harnishfeger took multiple pictures of the scene, including how the tub was placed on the counter, as demonstrated by Starbird, how M.S. was positioned in the tub (using a teddy bear as M.S.), and the position of the tub and the baby after the alleged fall. Tr. 93-101. Starbird told Harnishfeger that the tub was lying on its side on the floor, with the back against the cabinet and M.S. was lying on the floor away from the tub. Tr. 101. Starbird told him that he believed M.S.' kicking caused the tub to shift off the counter and fall. Tr. 105.

{¶5} After speaking with Starbird, Harnishfeger went to the hospital where he took photos of M.S.' injuries. Tr. 107. At that time, the only obvious injury to M.S. was the broken leg, which was splinted. Tr. 109-110. There were no bruises or signs of being gripped hard on M.S. Tr. 110. Harnishfeger also spoke with K.S. at the hospital. Tr. 107-111.

{¶6} On July 22, 2020, Starbird came to the police department for another interview. Prior to Starbird picking up M.S., there was no indication that he was injured. Tr. 115. Starbird also admitted that he actually had left M.S. in the tub alone for a couple of minutes rather than the couple of seconds he originally stated. Tr. 117. Starbird never indicated that anyone else could have harmed M.S. Tr. 120.

{¶7} On cross-examination Harnishfeger stated that the only inconsistency in the times he spoke with Starbird was the length of time Starbird was out of the room. Tr. 130. Harnishfeger also testified that he saw no bruising or handprints on M.S. when he saw him at the hospital. Tr. 131. After speaking with Starbird and viewing M.S., Harnishfeger turned the investigation over to Job and Family Services and forwarded it to the prosecutor for their review. Tr. 131. Harnishfeger did not charge Starbird with anything at that time.

{¶8} Cookee Shick ("Shick") testified that she works as an investigator for Job and Family Services. Tr. 135. Shick went with Harnishfeger to Starbird's home to investigate the injuries to M.S. Tr. 136. Shick testified that she had only interviewed Starbird and K.S. Tr. 140. When Starbird placed the tub on the counter, M.S.'s feet would not have been toward the ledge. Tr. 149. Starbird told Shick the same narrative told to Harnishfeger. Tr. 151-52. Starbird did not know what happened, but his theory was that M.S. must have pushed off the ledge above the tub and caused it to fall. Tr. 152. M.S. weighed nine pounds at the time. Tr. 153. M.S. would have had to push his own weight plus the weight of the tub and water

off the counter for it to fall to the floor. Tr. 153. Starbird never mentioned any water on the floor, any crying by M.S., or any indication that M.S.' leg was injured. Tr. 157.

{¶9} Shick identified Exhibit 34 as M.S.' medical records from St. Rita's. Tr. 162. The medical records indicate that K.S. told the emergency room personnel that M.S. was being bathed in the tub in the kitchen sink and that he fell on his leg, behind, and then the back of his head. Tr. 164. K.S. also indicated that Starbird had stated he tried to catch M.S. Tr. 164. The records also show that Starbird told a nurse M.S. had fallen when he was out of the room. Tr. 166. The hospital records indicate Starbird informed them he had consoled M.S. and that M.S.' leg did not look right. Tr. 166-67. Starbird also told the hospital personnel that he did not know if M.S. had struck his head. Tr. 167. Starbird claimed that he did not bring M.S. to the hospital immediately because he did not drive. Tr. 168. M.S. stayed in the hospital for two days and K.S. was there the entire time. Tr. 168-69. Starbird was not there because he drove home. Tr. 169. Starbird did not notify K.S. of the incident until she was getting off work in the afternoon; several hours after M.S. allegedly fell. Tr. 172.

{¶10} On cross-examination, Shick reread the notes from the hospital records that reported what K.S. had told the hospital personnel. Tr. 177. Shick admitted that the later statements were those given by Starbird himself. Tr. 177.

Starbird's statements to the nurse at the hospital were consistent with what he told Shick and Harnishfeger. Tr. 178.

{¶11} K.S. testified that on July 20, 2020, when she dropped M.S. at the babysitter, he appeared fine. Tr. 189-90. M.S. was born with hip dysplasia and was being treated for it. Tr. 191. The issue was with his left foot, the right was fine. Tr. 193-94. K.S. received a text message from Starbird saying they should not put the tub on the counter anymore as she was leaving work. Tr. 196. The text message did not indicate there was any kind of injuries or an emergency with M.S. Tr. 198. K.S. indicated that the hospital records were incorrect when it stated M.S. was born via a vaginal birth because she had an emergency c-section. Tr. 197. K.S. testified that Starbird had his own vehicle and drove himself to work regularly. Tr. 199-200. K.S. received many text messages from Starbird on July 20, 2020, indicating that he was tired and needed to sleep. Tr. 204-206. K.S. testified that when Starbird is tired, he is "irritable." Tr. 206.

{¶12} When questioned about M.S. and his personality, K.S. testified that on the day of the incident, M.S. was able to hold up his head and rock side to side, but not fully roll over. Tr. 194. M.S. did not like being changed and would squirm and try to move away from you. Tr. 211. M.S. also did not like baths. Tr. 211. Usually K.S. and Starbird bathed M.S. together. Tr. 212. M.S. was also colicky. Tr. 212.

{¶13} When K.S. got home from work, Starbird was waiting with M.S. Tr. 215. Starbird told K.S. that M.S. had fallen and they should go to the hospital. Tr.

215. M.S. was crying. Tr. 216. K.S. then took M.S. and he started screaming when she touched his leg. Tr. 217-18. While driving to the hospital, K.S. called her friend and told her what happened. Tr. 221. Starbird was sitting in the backseat by M.S. and did not contradict the story at any time. Tr. 221-22.

{¶14} At the hospital, Starbird was concerned and stood right beside K.S. while she spoke to the nurse. Tr. 22. K.S. reviewed the hospital intake records and noted that there are mistakes in it. Tr. 225. However, K.S. testified that she wasn't really paying attention to the background questions they asked so does not know if she answered wrong or they wrote it wrong. Tr. 225-26. The only thing she was sure of was that M.S. was two weeks premature, not full term, and she had a c-section, not a vaginal birth. Tr. 226. When she told the nurse what happened, Starbird was only a foot or so away and did not correct her. Tr. 226-27. When the medical staff took M.S. to the exam room, they allowed K.S. to go with them, but told Starbird he had to wait in the car. Tr. 227. While they took M.S. to x-ray, the nurses asked K.S. questions to which she did not know the answers, so she guessed. Tr. 228. Eventually the nurse told her there was a small break in the bone in his leg. Tr. 228. That was all she was told until Child Protective Services ("CPS") told her M.S. had a stress fracture in his leg and a broken rib. Tr. 230. No one told her there were any other injuries until the detective told her at a later date. Tr. 231.

{¶15} K.S. stayed with M.S. at the hospital for three days.[1] Tr. 231. Starbird stayed for a while, but left to go to work. Tr. 231. Starbird drove home, even though he does not have a driver's license. Tr. 232. K.S. testified that Starbird did not seek any medical treatment until she arrived home from work. Tr. 233. K.S. admitted that she personally did not know what happened because she was at work when M.S. was injured. Tr. 236.

{¶16} On cross-examination K.S. testified that the nurse who wrote the medical history did so in the examination room and Starbird was not present at that time to correct any errors in the background she provided. Tr. 242. K.S. also testified that Starbird's vehicle had mechanical issues and was not reliable. Tr. 243. Starbird would only take M.S. in his truck when picking M.S. up from the babysitter or before K.S. got her vehicle. Tr. 243-44. K.S. testified that Starbird treated M.S. very well, though Starbird would get frustrated with M.S. when Starbird was tired. Tr. 244-45. When Starbird became frustrated, he would walk away. Tr. 245. K.S. admitted that Starbird never told her he tried to catch M.S. when M.S. fell. Tr. 245-46. K.S. just assumed he was present and tried to catch him because that is what she would have done. Tr. 245. While K.S. was in the emergency room with M.S., Starbird had to wait in the car. Tr. 251. They communicated by phone until K.S.' phone died. Tr. 252.

---

[1] This Court notes that earlier testimony was that M.S. was in the hospital for two days.

{¶17} Brianna Budwit ("Budwit") testified that she babysat for M.S. for three days. Tr. 280. K.S. dropped M.S. off with his diaper bag and Starbird picked him up a couple hours later. Tr. 281-283. On July 20, 2020, K.S. dropped M.S. off with Budwit like normal. Tr. 286. M.S. was happy and had no sign of injury. Tr. 286. The next morning K.S. texted Budwit that M.S. had fallen while Starbird gave him a bath and was hurt. Tr. 289-90. In Budwit's opinion, M.S. could not have applied enough pressure to shift the tub off the counter. Tr. 294.

{¶18} Christina Markward ("Markward") testified that she was friends with Starbird and K.S. Tr. 299. On July 20, 2020, Markward was working with K.S. and was speaking to K.S. when K.S. started getting multiple text messages. Tr. 300. K.S. looked at the messages and said she had to go. Tr. 301. Later, K.S. called Markward and stated that K.S. and Starbird were taking M.S. to the hospital. K.S. told Markward that Starbird was bathing M.S. and the tub was placed on the bathroom counter. Tr. 302. While Starbird was getting a diaper, the tub fell off the counter with M.S. in it. Tr. 302. Job and Family Services placed M.S. with Markward a month or two after the incident and she had him for a week or two. Tr. 304-305. During that period, M.S. was not able to hold his own head up without support, roll over, or push up his own weight. Tr. 305-306. The police came to her home when she had M.S. and asked how she had obtained "custody" of the baby bathtub. Tr. 308. Markward testified the bathtub was provided by K.S. when M.S. was staying with Markward. Tr. 308. Markward testified that she picked the tub

up from K.S. and Starbird and at that time, it was placed on a shelf in a shed. Tr. 309. K.S. told Markward to throw it away. Tr. 309. The police took the bathtub from Markward. Tr. 310. Markward also testified that Starbird had previously lived with her. Tr. 310. If Starbird was woken from his sleep, he "was very cranky." Tr. 312.

{¶19} On cross-examination, Markward testified that when K.S. called her on the way to the hospital, M.S. was crying and K.S. was upset. Tr. 313. Markward also testified that when she spoke with Starbird about the incident, the story Starbird told her about what happened was similar to what K.S. had told her. Tr. 314. Markward came to get the bathtub because she asked K.S. for it and she used it to bathe M.S. when M.S. was placed with Markward. Tr. 315. According to Markward, K.S. told Markward to throw the bathtub away when she was done using it. Tr. 316.

{¶20} Dr. Derek Davis ("Davis") testified that he was the physician who treated M.S. in the emergency room. Tr. 321. The history he reviewed was provided by the triage notes of the nurse and the statements provided by K.S. Tr. 323. K.S. originally reported that Starbird was in the room and attempted to catch M.S. when he fell. Tr. 323. According to K.S., M.S. fell on his leg and hip before hitting the back of his head. Tr. 323. Later his nurse reported that Starbird told her he was not in the room, that he had left the room to retrieve something and M.S. fell from a height of two to three feet. Tr. 324. Davis ordered x-rays of M.S.' leg and hip and

a CT scan of his head. Tr. 325. Davis also ordered a chest x-ray. Tr. 325. The leg x-ray showed a displaced femur fracture. Tr. 326. The chest x-ray showed a rib fracture on the right side of M.S. Tr. 327. Based upon what Davis was told by K.S., "the mechanism didn't add up for the injuries as found." Tr. 330. The injuries should not have been so significant if M.S. had fallen from the reported height. Tr. 330. Davis testified to a reasonable degree of medical certainty, the injuries M.S. suffered did not occur from a fall of this nature. Tr. 331. Due to the injuries observed, Davis contacted the authorities. Tr. 332. Davis concluded that M.S.' injuries were caused by "nonaccidental trauma". Tr. 336. One of the reasons for this belief was that Starbird was not in the room. Tr. 337. Davis subsequently transferred M.S.' care to trauma services. Tr. 336. M.S. was admitted to the hospital for his own safety as child abuse was suspected. Tr. 340. M.S. was discharged from the hospital on July 24, 2020. Tr. 341.

{¶21} On cross-examination, Davis testified that seeing femur fractures in a child M.S.' age was very rare. Tr. 346. Davis admitted that although it would be rare to see injuries like M.S. had from the fall described, it was possible. Tr. 346. Davis also admitted that if the history had been consistent, he would not have been concerned. Tr. 347. The type of injury seen could possibly have occurred from the fall described, but the probability was low. Tr. 349. Davis indicated that the rib injury was not consistent with a fall. Tr. 349. Davis did admit that he never spoke

with Starbird, so all his information was coming second hand. Tr. 350. Davis also testified that he noted no bruising, redness, or fingermarks on M.S. Tr. 352.

{¶22} Ashley Knippen ("Knippen") testified that she is an investigator with the Hardin County Prosecutor's Office. Tr. 367. She picked up the tub from Markward. Tr. 369. Knippen testified that the sink countertop was approximately 31 ½ inches from the floor. Tr. 374. The depth of the countertop was 20 inches. Tr. 377. The depth of the ledge above the countertop was four inches. Tr. 377. The clearance between the countertop and the ledge was 9 ½ inches. Tr. 378. Knippen tested the stability of the countertop and found it was securely attached to the wall. Tr. 381-82. This was done because K.S. had indicated that the countertop was wobbly. Tr. 409. Knippen also determined that the countertop was fairly level. Tr. 385. The clearance between the top of the tub, when placed on the countertop, and the ledge was approximately one inch. Tr. 388. The tub weighed 2.99 lbs. Tr. 396. If the tub was filled to the maximum fill line, it would contain 4.15 lbs. of water. Tr. 399. If the tub was filled half way, which is beyond the maximum fill line, it would contain two gallons, which would weigh 16.6 lbs. Tr. 399-400.

{¶23} Detective Terry Sneary ("Sneary") testified that he works for the Hardin County Sheriff's Office. Tr. 410. Sneary was qualified to be a digital forensic examiner. Tr. 411. The weight of the tub was approximately 3 lbs. Tr. 416. M.S., per the medical records, weighed 9 lbs. 10 oz. on the day of the incident. Tr. 417. The combined weight of the tub, water, and child would be approximately

29 lbs. Tr. 417. Sneary testified that he did not believe it was possible for M.S. to move 29 lbs. Tr. 418.

{¶24} Sneary also testified that Starbird consented to a search of his cell phone. Tr. 423. Sneary reviewed the data looking for text messages between Starbird and K.S. Tr. 425. Starbird and K.S. were texting on the day of the incident and at 11:22 a.m., Starbird informed K.S. he was trying to sleep. Tr. 428. At 4:27 p.m., Starbird sent K.S. a text asking how he was "supposed to know that it wasn't stable." Tr. 430. Sneary testified that he personally tried to move the bathroom counter, but it was solidly attached to the wall. Tr. 431. Sneary also testified that the tub sat solidly on a flat surface. Tr. 431.

{¶25} Dr. Randall Schlievert ("Schlievert") testified that he is employed as a child abuse pediatrician with Mercy Health in Toledo. Tr. 440. Schlievert reviewed the medical records of M.S. Tr. 446. Schievert testified that M.S. has no signs of a brittle bone condition and the x-rays show "very healthy looking bones." Tr. 453. If M.S. did have this condition, you would expect to see further injuries after the one on July 20. Tr. 453. No further injuries have occurred in the seven months since his report. Tr. 454. Schlievert also testified that he has rereviewed the case multiple times and has reached the same conclusion each time. Tr. 455. Schlievert saw no signs of any disease with M.S. and his blood calcium was in the normal range. Tr. 458-59. After reviewing the interviews about what happened, Schlievert does not believe that falling from the counter would account for the

injuries of M.S. Tr. 460. Given the abilities of a 5-week-old child, M.S. could not have pushed himself and the tub off the counter merely by pushing on a ledge. Tr. 461. If M.S. would have fallen from the counter, he would have struck head first because that is where the greatest weight is found. Tr. 462-63. M.S.' head would have withstood the worst of the collision, so the injuries to the ribs and the leg would not have occurred. Tr. 463. M.S.' leg was not only broken, but was snapped in half and displaced. Tr. 463. The injury to the ribs occurs when you have repeated compression of the chest, usually seen when a baby is shaken or squeezed too hard to "stop" crying. Tr. 463-64. Schlievert testified that medically this usually occurs when a parent pushes down on the baby's chest to stop crying. Tr. 465. Additional x-rays were done to check if M.S. was shaken, but there was no indication of "shaken-baby". Tr. 465. The second set of x-rays did show that M.S. had a second rib broken as well. Tr. 467. According to Schlievert, there is no other situation besides repetitive squeezing which would cause the posterior rib fractures found in M.S. Tr. 472. The injury to M.S.' femur was a spiral fracture, which are caused by twisting and bending the bone at the same time. Tr. 474-75. Generally, this type of injury is seen when someone grabs the leg and jams it upwards. Tr. 477. Seeing this type of injury in a five-week-old infant is uncommon. Tr. 478. The usual injury for an infant who has fallen from a height is a skull fracture or a broken collar bone, not a broken leg or rib due to gravity pulling the heavier head down first. Tr. 479. Schlievert also testified that a colicky baby can result in situational child abuse if

the caregiver lacks coping skills. Tr. 483. In this case, there was no evidence to support the claim that M.S.' injuries were accidentally caused. Tr. 484. Schlievert's medical diagnosis was that M.S.' injuries were the result of child abuse. Tr. 486.

{¶26} On cross-examination, Schlievert testified that of all the cases he reviews for the State, about half are accidental and half are child abuse. Tr. 492-93. Schlievert testified that the injuries to the leg occurred on the day M.S. was brought to the emergency room. Tr. 496. Although the injuries to the skull and ribs could have occurred a day or so earlier, the symptoms displayed by M.S. do not indicate anything other than they occurred close in time to the break to the leg. Tr. 496-97. Schlievert indicated that although he mentioned "shaken-baby syndrome", he was not stating an opinion on whether M.S. was shaken. Tr. 498. Schlievert admitted that it was possible M.S. had osteogenesis imperfecta, which would cause his bones to easily break, but it was highly unlikely. Tr. 502. Schlievert based this opinion on the history of M.S., which showed no fractures prior to July 20, 2020, and no further fractures since that day. Tr. 502. M.S.' history of clubfoot and hip dysplasia are unrelated to M.S.' injuries on July 20, 2020. Tr. 505. Schlievert further testified that he did not know for sure what happened to M.S., just that the injuries were unlikely to have resulted from a fall from a bathroom counter. Tr. 519.

{¶27} At the conclusion of the trial, the jury found Starbird guilty as charged in the indictment, included a specific finding that the offense resulted in serious physical harm to the child. Doc. 58. On June 16, 2021, the trial court held a

sentencing hearing. The trial court sentenced Starbird to a prison term of eight to twelve years. Doc.72. Starbird appealed from this judgment and on appeal raises the following assignments of error.

### First Assignment of Error

**The conviction herein for child endangerment is not supported by sufficient evidence and as such all is improper and must be vacated.**

### Second Assignment of Error

**The conviction herein for child endangerment is against the manifest weight of the evidence and must be vacated.**

### Third Assignment of Error

**The conviction is based upon the jury having improperly made an inference upon an inference from the evidence which is improper and requires that the conviction herein must be vacated.**

### Fourth Assignment of Error

**Evidence Rule 601 requires that where medical testimony is presented, that the witness have an active clinical practice for their testimony to be admitted, and where such testimony is presented without meeting the qualification, the conviction is tainted and must be set aside.**

{¶28} We will address the assignments of error out of order.

*Inference Upon Inference*

{¶29} In the third assignment of error, Starbird claims that the jury had to make an inference upon an inference to find him guilty.

> **It is impermissible for a trier of fact to draw "[a]n inference based * * * entirely upon another inference, unsupported by any**

> **additional fact or another inference from other facts[.]"** If, however, the second inference is based in part upon another inference and in part upon facts, it is a parallel inference and, if reasonable, is permissible. Likewise, a trier of fact may draw multiple inferences from the same set of facts.

*State v. Jordan*, 3d Dist. Seneca Nos. 13-01-25, 13-01-26, and 13-01-27, 2002-Ohio-1418.

{¶30} Starbird argues that to find him guilty the jury had to infer that an act of violence must have occurred to cause M.S.' injuries and to infer that Starbird was the perpetrator of that act. Starbird is correct that the jury had to infer both of these facts as there was no direct evidence of them. However, it is possible for a reasonable juror to reach these determinations without stacking the inferences because there are separate facts to support both. Both Davis and Schlievert testified that the mechanism that caused the injuries to M.S. was not a fall, but a deliberate act. The doctors testified as to what acts were likely to cause the injuries and testified to a reasonable degree of medical certainty that a fall was highly unlikely to cause the injuries. Both doctors reached the conclusion that abuse was what caused the fractures in the leg, ribs, and skull. Given this testimony, a reasonable juror could infer that M.S. was the victim of child abuse, and not an accidental injury.

{¶31} As to the perpetrator of the abuse, testimony was provided that M.S. was healthy and injury free when K.S. dropped him at the sitter that morning. Budwit testified that he was fine when Starbird picked M.S. up to take him home.

Starbird was the only one home with the five-week-old infant. Starbird sent multiple texts to K.S. during the day, but did not once mention that M.S. appeared injured. The first time Starbird indicated that M.S. was hurt was several hours after he picked M.S. up and he told K.S. that M.S. had fallen from the counter while being bathed. From this set of facts, the jurors could reasonably conclude that Starbird was the one who injured M.S. As there were additional facts to support the second inference, it is permissible for the jurors to make it. The third assignment of error is overruled.

*Evidence Rule 601*

**{¶32}** Starbird alleges in his fourth assignment of error that the trial court erred in allowing the testimony of Schlievert because Schlievert was no longer a practicing pediatrician. Initially this Court notes that Starbird did not object to Schlievert's testimony at trial. Schlievert testified that he is a licensed pediatrician with training in child abuse and neglect. Tr. 442. He gave up his practice as a pediatrician as he is an assistant dean of the graduate medical education at the medical college in Toledo. Tr. 442. Starbird claims that because he does not spend at least half of his time as a practicing pediatrician, his testimony should not have been allowed.

**{¶33}** Evidence Rule 601 sets forth which people are disqualified to testify as a witness. However, the rule does not apply in this case.

**B) Disqualification of Witness in General. A person is disqualified to testify as a witness when the court determines that the person is:**

**(5) A person giving expert testimony** *on the issue of liability in any medical claim*, **as defined in R.C. 2305.113,** *asserted in any civil action* **against a physician, podiatrist, or hospital arising out of the diagnosis, care, or treatment of any person by a physician or podiatrist, unless:**

**\* \* \***

**(b) The person devotes at least one-half of his or her professional time to the active clinical practice in his or her field of licensure, or to its instruction in an accredited school[.]**

Evid.R. 601(B)(5) (emphasis added). The language of the rule limits the requirement to an expert testifying on the issue of liability in a medical malpractice claim in any civil action. Civil liability is not the issue in this criminal case. Therefore, the rule does not disqualify the testimony of Schlievert. The fourth assignment of error is overruled.

*Sufficiency of the Evidence*

{¶34} In his first assignment of error, Starbird claims that the conviction for endangering children is not supported by sufficient evidence. The question of whether the evidence presented at trial is legally sufficient to support a verdict is a question of law. *State v. Thompkins*, 78 Ohio St.3d 380, 386, 1997-Ohio-52, 678 N.E.2d 541. Sufficiency is a term of adequacy. *Id*.

**An appellate court's function when reviewing the sufficiency of the evidence to support a criminal conviction is to examine the evidence admitted at trial to determine whether such evidence, if**

-19-

**believed, would convince the average mind of the defendant's guilt beyond a reasonable doubt. \* \* \* Accordingly, "[t]he relevant inquiry is whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." \* \* \* "In deciding if the evidence was sufficient, we neither resolve evidentiary conflicts nor assess the credibility of witnesses, as both are functions reserved for the trier of fact."**

*State v. Hulbert*, 3d Dist. Van Wert No. 15-19-07, 2021-Ohio-2298, ¶ 5 (citations omitted).

**{¶35}** Here, Starbird was charged with endangering children in violation of R.C. 2919.22(B)(1), (E)(2)(d).

**(B) No person shall do any of the following to a child under eighteen years of age or a mentally or physically handicapped child under twenty-one years of age:**

**(1) Abuse the child;**

**\* \* \***

**(E)(1) Whoever violates this section is guilty of endangering children.**

**(2) If the offender violates division (A) or (B)(1) of this section, endangering children is one of the following, and, in the circumstances described in division (E)(2)(e) of this section, that division applies:**

**\* \* \***

**(d) If the violation is a violation of division (B)(1) of this section and results in serious physical harm to the child involved, a felony of the second degree.**

R.C. 2919.22. "Serious physical harm" is defined as follows.

**5) "Serious physical harm to persons" means any of the following:**

**\* \* \***

**(c) Any physical harm that involves some permanent incapacity, whether partial or total, or that involves some temporary, substantial incapacity;**

**\* \* \***

**(e) Any physical harm that involves acute pain of such duration as to result in substantial suffering or that involves any degree of prolonged or intractable pain.**

R.C. 2901.01(A)(5). The injuries in this case constitute serious physical harm. *State v. Swain*, 4th Dist. Ross No. 01CA2591, 2002-Ohio-414. (holding that infant's multiple broken bones constituted serious physical harm).

{¶36} The State presented testimony from K.S. and Budwit that M.S. was in good health before Starbird picked him up on July 20, 2020. Budwit testified that Starbird picked up M.S. K.S. testified that Starbird called her several hours later and told her M.S. was hurt. The testimony shows that Starbird was alone with M.S. until K.S. returned from work. M.S. was a five-week-old infant who was incapable of even rolling over at the time of the incident. The claims made by Starbird regarding how the injuries occurred were determined to be improbable. Both Davis and Schlievert testified that to a reasonable degree of medical certainty, the injuries did not result from a fall, but were instead the result of abuse. Schlievert testified that the injuries to the ribs required repeated compression, such as when one is pushing on the chest of an infant to stop the crying. Based upon the evidence before

it, a reasonable juror could conclude that someone acted in a way that caused physical injury to the child. Since Starbird was the only person with M.S. during the time when he was injured, the jury could also reasonably conclude that the person who caused the injury was Starbird. M.S.' injuries included a broken femur, two broken ribs, and a skull fracture. K.S. testified that M.S. would scream when his leg was touched showing that he suffered from severe pain. There were multiple fractures that caused prolonged pain and required him to be temporarily incapacitated while he was in a cast. Thus, the injuries suffered by M.S. would qualify as serious physical harm. Viewing the evidence in a light most favorable to the State, the evidence is sufficient to support the conviction. The first assignment of error is overruled.

*Manifest Weight of the Evidence*

{¶37} Starbird claims in his second assignment of error that the conviction was against the manifest weight of the evidence. When reviewing a judgment to determine if it is against the manifest weight of the evidence, an appellate court "review[s] the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Mendoza*, 137 Ohio App.3d 336, 2000-Ohio-1689, 738 N.E.2d 822 (3d Dist.). See, also, *State v. Thompkins*, 78 Ohio St.3d 380, 387, 678 N.E.2d 541 (1997). A new

trial should be granted only in the exceptional case in which the evidence weighs heavily against conviction. *Thompkins* at 387, 678 N.E.2d 541. Although the appellate court acts as a "thirteenth juror," due deference to the findings made by the fact-finder must still be given. *State v. Moorer*, 3d Dist. Seneca No. 13–12–22, 2013-Ohio-650, ¶ 29.

**{¶38}** The evidence in this case, as discussed previously shows that the injuries to M.S. were extensive. Starbird claims that he left the M.S. in the baby tub on the bathroom counter and left the room for a short time to retrieve a diaper. According to Starbird, he heard a thud, returned to the bathroom to find the tub and M.S. on the floor crying. Starbird then contacted K.S. and they took M.S. to the hospital. However, the testimony of Davis and Schlievert were that M.S. would not have been able to tip the tub at 5 weeks of age and that a fall from less than three foot would not have caused the break to the femur or the ribs. Sclievert testified that gravity would have caused the head to hit first as it is the heaviest part of an infant's body. This is a case where the jury had to either believe Starbird, who did testify, and his version of events, or not believe him. Evidence was presented that made Starbird's version of events improbable. The jury chose to disbelieve Starbird. A review of the record does not show that the jury clearly lost its way creating a manifest miscarriage of justice or that the evidence weighs heavily against conviction. Thus, the judgment was not against the manifest weight of the evidence and the second assignment of error is overruled.

**{¶39}** Having found no error prejudicial to the appellant in the particulars assigned and argued, the judgment of the Court of Common Pleas of Hardin County is affirmed.

***Judgment Affirmed***

**ZIMMERMAN, P.J. and MILLER, J., concur.**

**/hls**